---

MORSE et al. v. CHICAGO & E. I. R. CO. et al.

(Supreme Court, Appellate Division, First Department. June 5, 1903.)

1. CORPORATIONS—BOND ISSUE—EXCHANGE FOR FORMER ISSUE—TRUSTS.
   Where a corporation which succeeded to the rights and liabilities of another corporation, which had issued bonds secured by deed of trust, issued other bonds secured by deed of trust on the same property, and exceeding in amount the issue of the first corporation, and provided by by-law that the trustee should hold a sufficient amount of the second issue to exchange for such outstanding bonds as should be offered for exchange, no trust was created in favor of the holders of the outstanding bonds with respect to the exchange thereof.

2. SAME—LACHES IN PRESENTING FOR EXCHANGE.
   A corporation which had succeeded to the rights and liabilities of another corporation, which had issued bonds secured by deed of trust, issued other bonds secured by deed of trust on the same property. The second issue exceeded the first in amount, and it was provided by by-law that the trustee should hold a sufficient amount of the second issue to exchange for such first-issue bonds as should be offered for exchange. When the second-issue bonds were first placed on the market, their price was lower than the price of the first-issue bonds, and very few of the holders of first-issue bonds took advantage of the offer to exchange. After the lapse of some 18 years, when the first-issue bonds were nearly due, and were worth less than the second-issue bonds, holders thereof, with knowledge that the corporation had refused to make further exchanges without payment of the difference in value between the first and second issue bonds, brought action to compel such exchange. *Held,* that the right to such exchange was lost by laches.

Submission of controversy between Horace J. Morse and others and the Chicago & Eastern Illinois Railroad Company and another. Judgment for defendants.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

John L. Cadwalader, for plaintiffs.

E. Parmalee Prentice, for defendants.

LAUGHLIN, J. The defendant railroad company is the third Illinois corporation of the same name. For brevity the three railroad companies of that name will be referred to as the first, second, and third Chicago Companies, respectively. The plaintiffs are the owners and holders of bonds issued by the first company on the 1st day of September, 1877, to the amount of $41,000, par value, of principal, and they demand judgment that the defendant the third Chicago Company, which was organized on the 12th day of November, 1897, by the consolidation of the second Chicago Company and two other railroad corporations, execute, and that the defendant trust company authenticate and deliver to the plaintiffs in exchange for their said bonds, an equal amount of first consolidated mortgage bonds of the second Chicago Company, "without requiring the plaintiffs to pay to the defendants any amount of money as a consideration for such exchange, or on account of the difference in value of the bonds so to be exchanged." The defendants demand judgment that the plaintiffs are not entitled to such exchange of bonds without paying the difference in value thereof.

The bonds held by the plaintiffs are part of an issue of $3,000,000 6 per cent. bonds, payable on the 1st day of December, 1907, and secured by a trust deed of the property of the first Chicago Company, which owned a railroad 132 miles in length. That company also issued income mortgage bonds to the amount of $1,000,000 on the 1st day of December, 1877. The second Chicago Company was formed by the consolidation of the first and the Danville & Grape Creek Railroad Company. The Danville Company, prior to the consolidation, issued bonds to the extent of $250,000, secured by a mortgage upon its road. The second Chicago Company succeeded to all the property of the other two companies, and became subject to all of their liabilities. After the consolidation the second Chicago Company issued "extension first mortgage bonds" to the amount of $250,000. After this issue the bonded indebtedness of the second Chicago Company, secured by mortgages, aggregated $4,500,000. Thereafter, and on the 20th day of May, 1884, its stockholders, with a view to refunding this bonded indebtedness, and to raising $1,500,000 for improvements, adopted a resolution authorizing the issue of a series of bonds of $1,000 each, aggregating $6,000,000, to be dated June 2, 1884, and payable in gold on the 1st day of October, 1934, with 6 per cent. interest semiannually, represented by coupons to be attached to the bonds, $4,500,000 of the bonds, numbered from 1 to 4,500, inclusive, to be deposited with the Central Trust Company of New York, to be issued from time to time by said trust company to the holders of bonds constituting any part of the then outstanding bonds, aggregating $4,500,000, in amounts equal to the amount of such outstanding bonds surrendered by such holders, "or in exchange therefor from time to time, as may be in manner provided by the

board of directors." On the 24th day of the same month the board of directors adopted resolutions authorizing and directing the execution of the mortgage and issue of the bonds in accordance with the authorization of the stockholders, and also a resolution authorizing the trust company, upon presentation and delivery to it of any of said outstanding bonds by the holders thereof, to "deliver to the party or person so delivering up and surrendering said bonds an equal amount in par value of the said bonds so deposited with it, up to and amounting to $4,500,000," and providing for the like exchange of bonds in favor of the second Chicago Company as to any of the outstanding issue that it may have or procure, and providing for the method of stamping and destroying the bonds so surrendered. The second Chicago Company executed and delivered to the trust company a mortgage or deed of trust as authorized, known as its "first consolidated mortgage," and the same was duly recorded. This mortgage, after reciting the resolutions and previous issues of bonds to which reference has been made, contained the following recital:

"Whereas it has been determined that four thousand five hundred of the bonds hereby authorized, amounting in the aggregate to four million five hundred thousand dollars, shall be reserved and shall only be issued and used for the purpose of being exchanged for or providing for the payment of the outstanding bonds of said first party before mentioned, amounting in the aggregate to four million five hundred thousand dollars, and for no other purpose or purposes whatever, that the bonds to be issued at once shall be numbered from number four thousand five hundred and one to number six thousand, both inclusive, and those reserved and authorized but not issued shall be numbered from number one to number four thousand five hundred, both inclusive, and in case the said Chicago and Eastern Illinois Railroad Company, or any other party or person, shall present to said Central Trust Company of New York any part or portion of said bonds above described as secured by the mortgages or deeds of trust of September 1st, 1877, December 1st, 1877, April 15, 1880, or December 1st, 1881, then the same shall be cancelled by said Central Trust Company, as indicated in the resolutions of the board of directors of the said party of the first part, and a like amount in par value of the said bonds so reserved under this mortgage or deed of trust, issued to the party who may deliver said bonds for cancellation, as above stated."

The second Chicago Company caused the entire issue of second mortgage bonds to be prepared and engraved as authorized, but it at first only executed and delivered to the trust company the last 1,500 of the series, which were sold for the purpose of creating a fund for improving the road.

It is evident that the holders of the outstanding bonds were slow in presenting the same for exchange, for down to the 4th day of April, 1890, when further exchange was prohibited, the aggregate amount of these bonds exchanged was $1,288,000, and all of these but $11,000 had been bought up by the railroad company mortgagor, or its successor, and were surrendered and exchanged in its own interest. It appears that on or before the 11th day of March, 1885, the second Chicago Company applied to the New York Stock Exchange for listing $2,500,000 of its first consolidated mortgage bonds; 1,500 of these being the last of the series, and the first that were issued, and the other 1,000 being part of the 4,500 which it was originally contemplated should be held by the trust company for the purpose of

exchange. It was stated in the application, which was granted, that they were part of the issue of $6,000,000 in bonds issued for the purpose of retiring the present existing mortgage indebtedness of the company, and for the purpose of making improvements, and that the deed of trust provided that the trustees should retain $4,500,000 of the bonds—that being the amount of the outstanding mortgage indebtedness—"and shall exchange them for any of the present outstanding bonds on presentation and surrender of the same." The application was granted, and they were so listed on the day last mentioned. On the 11th day of April, 1887, a similar application was made for listing on the New York Stock Exchange 500 more of the bonds originally intended for exchange. The application stated that these bonds were deposited with the trust company to be exchanged for the quarter of a million outstanding bonds of the Danville Company, and a like amount of the extension first mortgage bonds of the second Chicago Company, and that exchange had been made to the extent of $248,000. The application further stated that the exchange did not increase the company's indebtedness, and that, for each consolidated bond issued by the trust company, one of the outstanding bonds of the class specified "must be surrendered, and the same canceled and destroyed" by the trust company.

The entire issue of $1,000,000 income mortgage bonds of the first Chicago Company, with the exception of two bonds, of $500 each, was purchased from time to time by the second and third Chicago Companies, and exchanged for first consolidated mortgage bonds. These companies also purchased, from time to time, outstanding Danville & Grape Creek bonds, to the extent of $131,000. They likewise purchased $147,000 in par value of the extension mortgage bonds, and surrendered and exchanged the same for first consolidated mortgage bonds. These exchanges of bonds, aggregating $1,277,000, were made at the request of, and for the benefit of, the railroad companies. None of the bonds deposited with the trust company for exchange, except said $1,277,000, were ever executed by any of said railroad companies, with the exception of 11 which were executed by the third Chicago Company, pursuant to a request of the vice president of the trust company, in December, 1889; saying that the trust company desired these bonds to exchange for a like amount of outstanding bonds. The president of the third Chicago Company executed these bonds pursuant to this request, but without the knowledge or authority of the board of directors or executive committee.

On the 21st of January, 1890, the executive committee of the third Chicago Company, having the authority and powers of a board of directors when the board was not in session, upon learning of this exchange of bonds, adopted a resolution, which was communicated to the trust company, to the effect that thereafter none of the first consolidated mortgage bonds should be issued in exchange for first mortgage bonds issued under the deed of trust bearing date September 1, 1877, except with the authority of the executive committee. On the 27th day of March thereafter an application for the exchange of bonds aggregating $1,000 was refused by the trust company, by di-

rection of the executive committee of the railroad, and there has been no such exchange since, except to the third Chicago Company itself.

The plaintiffs purchased the bonds which they desired to exchange by eight transactions, the first being on the 15th of August, 1901, and the last on the 11th of February, 1902; and they knew that the defendants had refused to make exchanges, and also knew that the first consolidated mortgage bonds were of greater value, and were selling at a higher price on the stock exchange, at the several times of such purchases, than the first mortgage bonds. Prior to the month of March, 1887, the outstanding first mortgage bonds were sold on the New York Stock Exchange at prices higher than those received for the first consolidated mortgage bonds; the prices, however, gradually approaching equality until that month, when the first consolidated mortgage bonds sold higher than the others. During the following year the prices of the two classes of bonds remained substantially the same, but since then the price of the first consolidated mortgage bonds has been higher than that of the others, and gradually the difference in the price of the two classes of bonds increased, until August, 1901, when the price of the first consolidated mortgage bonds was 137½, and that of the others was 112. On the 15th of August, 1901, the trust company having recently informed the defendant railroad company of another application for exchange of bonds, its board of directors adopted a resolution authorizing the trust company to issue first mortgage consolidated bonds in exchange for outstanding bonds upon the holders paying the trustee, in cash, for the use and benefit of the railroad company, the difference in value between the bonds, adjusted on a 4 per cent. basis, and delivered a certified copy thereof to the trust company. The stipulated facts show that the plaintiffs were on the same day fully advised of this action, and that the bonds would not be exchanged upon any other terms, and presumably before their first purchase. On the 27th day of February, 1902, the plaintiffs tendered a surrender of their bonds, and demanded an equal amount in exchange therefor, in accordance with the trust agreement creating the Central Trust Company a trustee.

We are of opinion that by the proceedings of the second Chicago Company, and its mortgage or deed to the Central Trust Company, no trust was created in favor of the holders of the outstanding bonds with respect to the exchange of bonds. Mott v. New York Security & Trust Co., 29 Misc. Rep. 39, 60 N. Y. Supp. 357; Id., 52 App. Div. 623, 65 N. Y. Supp. 190. It is manifest that the action was not taken for the benefit of those holders, nor was it in the least influenced by a consideration of their interests. The object of the railroad company was to create a fund for the purpose of making extensive improvements. It was supposed, and undoubtedly was the fact, that first mortgage bonds would sell better in the market than second mortgage bonds. The outstanding bonds were already secured by mortgages upon all the property of the company which issued them. Unless provision was made for redeeming those bonds, any other mortgage would be a second mortgage. The company was willing at that time to refund its existing indebtedness, and to issue new bonds at the same rate of interest, in equal amount, in exchange for

the outstanding bonds surrendered; the only difference being the terms of payment. Had the holders of the outstanding bonds presented the same for surrender, cancellation, and exchange, as was the desire and for the interest of the railroad company, the company might have sold that part of the new issue of bonds which was to be sold in the market at a higher rate. The holders of the outstanding bonds rested upon the security which they then had. For a time their bonds were worth more than the new issue, and it was not until after the first mortgage consolidated bonds sold at a higher premium that there was any offer of outstanding bonds for surrender, cancellation, and exchange. As the old bonds drew near maturity, naturally their value, which was above par, decreased, and they were not as desirable as an investment. The new issue of bonds, which were not to mature for a long period, and bore 6 per cent. semiannual interest, naturally became more desirable as an investment as the current rate of interest declined. When this condition arose, it was not for the interest of the corporation, for whose sole benefit the trust scheme was devised and executed, to continue the exchange of the bonds on an equality, and it accordingly determined to make no further exchanges. The trust company was powerless to make the exchange without further action on the part of the corporation, for the reason that the bonds had not been signed. The company still, preferring to have the outstanding bonds cancelled, consented to and authorized the trust company to make exchanges, provided the holders of the outstanding bonds would pay in cash the difference in value. After the lapse of 17 years from the time the company manifested its willingness to exchange these bonds at par, the holders presented the same for redemption upon the terms originally offered. In the meantime the company had taken further action and withdrawn its offer. While no time for presenting these bonds is specified in the resolution or in the mortgage, yet it is manifest that it was the intention of the company, and it is the fair construction of the resolutions and mortgage, that this should be done within a reasonable time; and upon the failure of the holders of the outstanding bonds to present the same, and demand the privilege offered by the resolution, within a reasonable time, any rights they might otherwise have had were lost by their own laches. New York Security & T. Co. v. Louisville, etc., Consol. R. Co. (C. C.) 97 Fed. 226. Any other rule would authorize the holders of these bonds to present the same up to the day of maturity, and demand new bonds in exchange therefor. The mere statement of the result to which such a construction would lead demonstrates that it would be unreasonable. The holders of the outstanding bonds were not parties to these new agreements. No trust was created for their benefit. It may be said that one of the purposes of the arrangement was to pay off the outstanding bonds, and, when default is made in the payment of the principal or interest of those bonds, it will then be time enough to consider what rights, if any, the holders of those bonds acquired under the agreement.

It follows that the defendants should have judgment as prayed for in the submission, but without costs, it being stipulated that no costs are to be awarded. All concur.